UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAVETTE BUTLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-01033 (APM) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

In June 2016, Plaintiff Davette Butler brought this Individuals with Disabilities Education

Act lawsuit against the District of Columbia Public Schools ("DCPS") on behalf of her minor son,

D.B., after a Hearing Officer determined that DCPS had denied D.B. a "free appropriate public

education," or "FAPE," for the 2014–2015 and 2015–2016 school years but declined to award any

compensatory education for those years.  On summary judgment, the court remanded the case back

to the Hearing Officer to determine an appropriate compensatory education award for D.B.  The

Hearing Officer then ordered a battery of evaluations and assessments, but lamentably, the case

languished for over a year as DCPS struggled to identify providers to perform the evaluations.

Plaintiff returned to this court, which ordered DCPS to conduct the necessary evaluations,

including a compensatory education evaluation, so that the court could fashion an appropriate

compensatory education award.  It took over a year to complete those evaluations, after which the

court held a contested evidentiary hearing.  That hearing closed the record nearly four years after

the case commenced.

A historical recitation of this case shows that DCPS, the administrative law system, and

the courts all failed D.B.  A young man who was denied a FAPE over five years ago is no longer

young.  He is 20 years old and yet operates at below a kindergarten level.  What little progress he once made is long gone, having evaporated while his case bounced back and forth between administrative hearings and this court and as the case stalled pending new evaluations.  And, instead of focusing on D.B.'s best interests, DCPS has fought his mother's efforts to rectify wrongs at every step.  The District's obstinance is as inexplicable as it is troubling.  Though D.B. ultimately prevails here, he does so at great cost.  The system failed him.  We should all ask why.

Having reviewed the record and following an evidentiary hearing on the matter, for the denial of FAPE for the 2014–2015 and 2015–2016 school years, the court awards D.B. 1,100 hours of specialized instruction, 88 hours of occupational therapy, 100 hours of adapted physical education therapy, and 132 hours of orientation and mobility support therapy.

**I.**

D.B. has suffered from blindness, physical limitations, and mental health disabilities since birth.  Admin. R., ECF No. 8 [hereinafter A.R.], at 44–55; Not. of Filing of Compensatory Education Evaluation, ECF No. 53, Ex. 1, ECF No. 53-1 [hereinafter Pl.'s Rpt.], at 3.  In July 2014, DCPS developed an individualized education program ("IEP") for D.B. for the 2014–2015 school year, which designated his school placement as Woodrow Wilson High School.  A.R. at 92–93.  D.B.'s school year was cut short, however, after he was allegedly sexually assaulted in a school bathroom in September.  *Id*. at 94–95, Pl.'s Rpt. at 4.  Plaintiff requested a change in her son's school placement, which DCPS did not carry out until June 2015, A.R. at 97, 113–14, 143, but because the new placement did not provide D.B. the services he needed, he did not attend, *id*. at 113, 190–91.

In December 2015, Plaintiff filed a due process complaint under the Individuals with Disabilities Education Act ("IDEA") on behalf of D.B., alleging that DCPS had denied her son a

FAPE for the 2014–2015 and 2015–2016 school years. *Id*. at 147–50, 190–91. Following an evidentiary hearing, a Hearing Officer determined that DCPS had denied D.B. a FAPE for both years by (1) failing to convene D.B.'s entire IEP team to review his school placement following the alleged assault in September 2014; and (2) failing to revise D.B.'s IEP for the 2015–2016 school year. *Id*. at 20–21. The Hearing Officer did not, however, award D.B. compensatory education. He explained that although Plaintiff's expert had proposed an award, the evidence did not establish "what position [D.B.] would now occupy if he had attended school after September 8, 2014 or the type and amount of services he would need to regain that position." *Id*. at 24–25. In so doing, the Hearing Officer rejected Plaintiff's expert's testimony as "speculative" and insufficient "to craft an appropriate, specific fact based, compensatory education remedy," and he denied the request for compensatory education "without prejudice." *Id*. at 25–26.

Plaintiff then filed this action, challenging the Hearing Officer's refusal to award compensatory education. Plaintiff sought an award of compensatory education based on the expert testimony presented at the administrative hearing, or alternatively, she requested an order directing DCPS to develop an appropriate compensatory education plan or order a compensatory education evaluation. *See* Pl.'s Mot. for Summ. J., ECF No. 9, at 12–18. On summary judgment, the court held that the Hearing Officer erred in denying, even without prejudice, Plaintiff's request for compensatory education, but it concluded that the record lacked the necessary information to fashion an appropriate compensatory education award. *Butler v. District of Columbia*, 275 F. Supp. 3d 1, 5–6 (D.D.C. 2017). Specifically, the expert testimony did not "address the basic factors that must be considered in developing an appropriate compensatory education plan," including "D.B.'s present cognitive or behavioral disabilities," in "what areas D.B. had regressed and to what degree," and "what position D.B. would have been in absent the FAPE denial." *Id.* at

6. The court remanded the matter back to the Hearing Officer to "conduct a fact-specific inquiry to determine the amount of compensatory education owed to D.B." *Id.* at 7.

On November 10, 2017, the Hearing Officer on remand ordered a battery of evaluations aimed at determining a compensatory education award. *See* Status Report, ECF No. 20. These included an orientation and mobility assessment, an adaptive physical education assessment, a comprehensive psychological evaluation, and an occupational therapy evaluation. *See* Status Report, ECF No. 21. The Hearing Officer did not order a compensatory education evaluation, even though the parties did not dispute the need for one. *See* Status Report, ECF No. 20.

Unfortunately, as of August 19, 2018, one year after this court's remand order, DCPS still had conducted no evaluations. *See* Status Reports, ECF Nos. 20, 21, 22, 23, 24. Plaintiff then moved for relief from the summary judgment order, asking the court to "issue a final compensatory education determination," given the lack of progress on remand. Pl.'s Mot. for Revision of J., ECF No. 26, at 6. The court denied the motion, explaining that it could not "craft an award compensating for past violations without updated individualized assessments." Order, ECF No. 35 (internal quotation marks and citation omitted). The court, however, ordered the District to complete a compensatory education evaluation and agreed to take evidence regarding a proper compensatory education package. *See* 10/29/2018 Status Hr'g; Order, ECF No. 36; *see also Branham v. District of Columbia*, 427 F.3d 7, 13 (D.C. Cir. 2005) ("[I]n light of the educational harms [the student] has already suffered, we encourage the district court to undertake the evidentiary hearing itself in order to minimize the potential for further delay."). By February 2019, all four evaluations ordered by the Hearing Officer were completed. *See* 2/12/19 Status Hr'g. After some delay, both Plaintiff and DCPS retained compensatory education experts, who submitted competing evaluations. *See* Status Report, ECF No. 54; *see generally* Pls.' Rpt.; Errata,

ECF No. 55, Ex. 1, ECF No. 55-1 [hereinafter Def.'s Rpt.].  The court held an evidentiary hearing

on March 10, 2020.  *See* 3/10/2020 Minute Entry.

## II.

Courts have "broad discretion" to fashion remedies for IDEA violations.  *Florence Cnty.*

*Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 16 (1993) (citation omitted); *Boose v. District*

*of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015).  Such remedies may include compensatory

education in the form of programs that "make up for prior deficiencies."  *Reid ex rel. Reid v.*

*District of Columbia*, 401 F.3d 516, 522 (D.C. Cir. 2005).  A compensatory education program

focuses on a disabled student's "individual needs," and accordingly, it must "rely on individualized

assessments" of the student.  *Id.* at 524.  The court's remedial inquiry therefore is fact-specific and

equitable, "produc[ing] different results in different cases depending on the child's needs."  *Id*; *see*

*also B.D. v. District of Columbia*, 817 F.3d 792, 799 (D.C. Cir. 2016) ("[C]ompensatory education

awards require a 'flexible approach' tailored to the facts of each case . . . .").  In fashioning a

compensatory education award, the court is guided by the principle that, "[t]o fully compensate a

student, the award must seek not only to undo the FAPE denial's affirmative harm, but also to

compensate for lost progress that the student would have made."  *B.D.*, 817 F.3d at 798; *see also*

*Reid*, 401 F.3d at 527 (holding that compensatory education must be "an informed and reasonable

exercise of discretion regarding what services [the student] needs to elevate him to the position he

would have occupied absent the school district's failures"); *cf. Endrew F. ex rel. Joseph F. v.*

*Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017) (explaining that the IDEA "requires an

educational program reasonably calculated to enable a child to make progress appropriate in light

of the child's circumstances").  This inquiry requires "figuring out both  what position a student

would be in absent a FAPE denial and how to get the student to that position." *B.D.*, 817 F.3d at 799.

Applying the above principles requires the court to give careful consideration to D.B.'s specific disabilities, development, and academic progress—or lack thereof—during the 2014–2015 and 2015–2016 school years. The court first reviews D.B.'s most recent evaluations as measured against records from 2014 and prior in order to assess changes in D.B.'s development in the intervening years. The court then reviews both Plaintiff's and Defendant's experts' compensatory education recommendations.

### 1. *D.B.'s Developmental and Educational Progress Since the Denial of FAPE*

The record shows that D.B. has a complex medical, developmental, and educational history. As noted, he was born with a genetic condition that rendered him blind in both eyes. Pl.'s Rpt. at 3; Def.'s Rpt. at 2. Additionally, he suffers from heart arrhythmia, sinusitis, limited rotation of wrists, speech deficits, asthma, and underwent a spinal fusion surgery due to scoliosis. Pl.'s Rpt. at 3; Def.'s Rpt. at 2. D.B.'s academic history reveals the District's repeated failure to meet D.B.'s complex needs throughout his young life. Pl.'s Rpt. at 3–6; Def.'s Rpt. at 3–8. An IEP developed by DCPS in May 2013 found that D.B., then thirteen years old, was performing at a kindergarten level using Braille, his mobility was supported by a sighted guide, and he could navigate independently between familiar locations using a two-handed long cane and with the help of verbal cues. Pl.'s Rpt. at 4; *see also* Def.'s Rpt. at 5 (noting that D.B. was "making steady progress"). This IEP also found that D.B. demonstrated "some academic gains" and "responded to intervention." Pl.'s Rpt. at 4. FAPE was denied for the 2014–2015 and 2015–2016 school years, during which time D.B. received only limited services through providers at home because

of a previous compensatory education award for the 2013–2014 school year.  Pl.'s Rpt. at 5; Def.'s Rpt. at 6.

Both compensatory education evaluations make clear that D.B.'s absence from school and the dearth of resources he has received since 2014 have had a devastating effect on D.B. across all metrics of development.  Academically, D.B. has shown no progress in core areas.  Pl.'s Rpt. at 6–7; Def.'s Rpt. at 20.  A December 16, 2017 vocational evaluation determined that D.B.'s general and academic skills "place him below the 0.1 percentile and below a kindergarten level."  Pl.'s Rpt. at 6.  According to Plaintiff's expert, academic progress could have occurred if D.B. had had "access to Braille, tactile graphics, object and/or tactile symbols, audio stimuli devices, and other forms of technology as is appropriate for a blind student."  *Id.* at 15.  Instead, D.B. has lost functional use of Braille, and his proficiency has regressed from a kindergarten level in 2013 to a low kindergarten level.  Pl.'s Rpt. at 18.  A comprehensive psychological evaluation conducted in 2019 revealed that while D.B., at that point 19 years old, could name Braille letters, he could no longer read Braille words or numbers.  *Id.* at 11.

D.B.'s lack of schooling since 2014 has also stalled his personal and psychological development.  During a comprehensive psychological evaluation conducted in March 2019, which tested D.B.'s general intellectual ability, D.B. scored either Low and Very Low on all subtests he was able to take, indicating that "little to no progress has occurred for D.B. in the four plus years since" he was last evaluated in 2014.  *Id.* at 12.  In fact, the results found "indications that some regression occurred in some areas."  *Id.* at 11–12.  D.B.'s social and emotional functioning has also suffered.  Since 2015, D.B. has become overly dependent on his family, his symptoms of separation anxiety persist, and he has not effectively processed the alleged 2014 sexual assault.  *Id.* at 18.  If D.B. had been placed in an appropriate school setting, Plaintiff's expert opines, the

need for counseling services would have become apparent.  *Id*.  D.B. also has had no access to career education that would have taught him work-related skills "such as responsibility, punctuality, focus, and perseverance."  *Id.* at 14.  As a result, D.B. is now "unprepared, at the age of 19, to explore and discover his career strengths and interests."  *Id.*  With respect to independent living skills, "D.B. continues to display deficits in his personal hygiene, food preparation, time and money management, clothing care, and household tasks."  *Id.* at 15; *see also* Def.'s Rpt. at 20.

Physically, D.B. has regressed in strength, range of motion, posture, and balance since 2014.  Pl.'s Rpt. at 10–11; Def.'s Rpt. at 19.  An occupational therapy evaluation conducted in September 2018 found muscle atrophy, which "most likely occurred due [to] D.B.'s lack of access to a school setting where he would be regularly mobile, participate in an [adapted physical education] program, and receive therapy."  Pl.'s Rpt. at 10; *see also* Def.'s Rpt. at 18.  An adapted physical education evaluation conducted in September 2018 found that "D.B. needs growth in ALL the areas assessed, including: flexibility, balance, muscular strength, locomotor movements and object control skills."  Pl.'s Rpt. at 7.  The evaluator determined that "D.B. had not made any progress towards the [adapted physical education] goals assigned to him prior to assessment."  *Id.* at 8.  Likewise, an orientation and mobility assessment revealed that D.B. "lacks the prerequisite directional skills to understand key concepts," and had "regressed in his skill to navigate the neighborhood" because of a lack of continued training and practice.  *Id.*; *see also* Def.'s Rpt. at 19.  Absent occupational therapy services, he has become more dependent on his family with respect to physical movement, which raises physical safety concerns and impacts D.B.'s access to community resources and his performance at home and in the community.  Pl.'s Rpt. at 18.

2.  *The Expert Recommendations*

In view of these assessments, Plaintiff's expert, Jay Michney, concluded that the denial of FAPE has caused "long-term harm that requires intensive compensatory education for D.B. to have any chance of recovering lost skills, learning new information, improving physical skills, and increasing independence." *Id.* at 14.  He estimated D.B. "missed approximately 2,156 specialized instruction hours outside of general education, close to 700 hours of instruction within general education, nearly 3,100 hours of support from a dedicated aide, over 88 hours occupational therapy, 132 hours of orientation and mobility support, and 100 hours of adapted physical education." *Id.* at 22.  Michney therefore recommends specialized instruction and services in the following areas.

*First*, to remedy the educational harm caused by the denial of FAPE, Michney proposes 1,100 hours of tutoring and specialized instruction with a nationally certified literary Braille teacher of the blind and in the Expanded Core Curriculum (ECC), a curriculum for blind students intended to build their "independent living skills, orientation and mobility, social interaction, self-determination, assistive technology, recreation, sensory efficiency, career education, and compensatory skills." Pl.'s Rpt. at 19.  Michney testified that he arrived at this number by looking at the services and hours D.B. was denied, the degree to which he "has either plateaued in skilled areas or regressed in skilled areas," and his cognitive profile.  Draft 3/10/2020 Hr'g Tr. at 29–30.  The 1,100 hours represents a "reasonable estimation of the number of hours that [Michney] think[s] are necessary to make up for the amount of time that has been established as the denial of FAPE." *Id.* at 30.

*Second*, to address harm to D.B's orientation and mobility skills, Michney recommends 132 hours of Orientation and Mobility Training with a skilled orientation and mobility specialist.

Def.'s Rpt. at 20.  These hours are intended to "help D.B. understand and apply directional and positional concepts, increase understanding of the outdoor environment, plan orientation and mobility supported ECC goals, and gain independence."  *Id.* at 20; *see also* Draft 3/10/2020 Hr'g Tr. at 37–38.

*Third*, to address D.B.'s regression in strength, range of motion, posture, and balance, Michney proposes 88 hours of Occupational Therapy Services "provided by a skilled occupational therapist that will help D.B. to increase strength and flexibility, enhance balance and range of motion, and improve overall independence and confidence."  Pl.'s Rpt. at 21; *see also* Draft 3/10/2020 Hr'g Tr. at 39.

*Fourth*, to address D.B.'s lack of progress towards his adapted physical education goals, Michney suggests 100 hours of Adapted Physical Education "by a skilled adapted physical education teacher . . . to increase flexibility, balance, muscular strength, locomotor movements, and object control skills."  Pl.'s Rpt. at 22; *see also* Draft 3/10/2020 Hr'g Tr. at 39–40.

Defendant's expert, Dr. Tina Nguyen, on the other hand, found that "there is no evidence to document any regression over" the 2014–2015 school year.  Further, she cited an "authorization letter" dated July 8, 2014, which indicated that D.B. had already been "provided with 150 hours of tutoring services, 140 hours of occupational therapy services, 140 hours of Adapted Physical Education services, and 130 hours of vision therapy services."  Def.'s Rpt. at 29; *see also* Draft 3/10/2020 Hr'g Tr. at 88–89.  For the 2015–2016 school year, Dr. Nguyen noted that D.B. was unable to attend school for approximately 18 weeks due to complications from scoliosis surgery.  By Dr. Nguyen's calculations, D.B received 25 hours of Adapted Physical Education services out of 63.5 hours he was awarded, 93 hours of Occupational Therapy services out of 127 hours awarded; 49 hours of Tutoring services out of 89.5 hours awarded, and 62 hours of Vision services

out of 77 hours awarded. Def.'s Rpt. at 30. Dr. Nguyen therefore did not recommend "further compensatory services" for the 2015–2016 school year "due to the fact that [D.B] himself was not available for a part of the school year as he was hospitalized and DCPS had already awarded him compensatory services for this school year." *Id.* Notwithstanding these recommendations regarding the two school years in question, she urges an award of "compensatory residential school placement at the Maryland School for the Blind or the equivalent until [D.B.] is 21 years old." *Id.* at 34. At the evidentiary hearing, Dr. Nguyen amended her recommendation to at least two years of residential services. Draft 3/10/2020 Hr'g Tr. at 94. Dr. Nguyen did not dispute the services or hours recommended by Plaintiff's expert, but instead maintained that the only effective educational setting for D.B. is a residential school for the blind just north of Baltimore. In Dr. Nguyen's view, D.B. had made little progress receiving services from providers in his home environment and requires "a school placement that would allow for him to consistently reinforce and build on his skills" with an eye towards "mastery of basic independent living skills." Def.'s Rpt. at 33.

### 3. *The Compensatory Education Award*

The court turns now to crafting a compensatory education award. As explained, the compensatory education award "must seek not only to undo the FAPE denial's affirmative harm, but also to compensate for lost progress that the student would have made." *B.D.*, 817 F.3d at 798. It is undisputed that D.B. was denied a FAPE for the 2014–2015 and 2015–2016 school years, and the record demonstrates that D.B. suffered serious educational harms as a result. Following his removal from Wilson High School in early September 2014, D.B. received no specialized education services. During both years, he received only limited services as a compensatory education award for a previous academic year during which he was also denied a FAPE. *See* Draft

3/10/2020 Hr'g Tr. at 88–90; Pl.'s Rpt. at 4–5; Def.'s Rpt. at 5–6.  A July 8, 2014 IEP consisted

of 24.5 hours per week of specialized instruction outside the general education setting, including

10 hours with a vision teacher, 240 minutes of occupational therapy outside the general education

setting per month, 270 minutes of adapted physical education services outside the general

education per month, 360 minutes of orientation and mobility services per month, as well as a

dedicated aide for 32 hours per week.  Pl's. Rpt. at 4–5; Def.'s Rpt. at 6.  A separate IEP dated

May 28, 2015 made the same recommendations.  Based on these IEPs, the court estimates that for

both school years,[1] D.B. should have received approximately 2,058 specialized instruction hours

outside of general education, nearly 2,688 hours of support from a dedicated aide, 88 hours of

occupational therapy and another 99 of adapted physical education, and 132 hours of orientation

and mobility support.  Considering that D.B. received some service hours at Wilson High School

from August to September 2014,[2] the court estimates that in total, D.B. was wrongfully denied

approximately 1,960 hours of specialized instruction, 2,560 hours of support from a dedicated aide,

84 hours of occupational therapy, 94.5 hours of adapted physical education, and 126 hours of

orientation and mobility support.[3]

---

[1] There were 42 weeks in the Extended School Years for both 2014–2015 and 2015–2016, which ran from August through July.  *See* Def.'s Rpt. at 29–30; Pl.'s Rpt. at 4 (noting D.B. began the 2014 school year in August 2014).

[2] Dr. Nguyen maintains that D.B. already received compensatory education hours for the 2014–2015 school year.  *See* Def.'s Rpt. at 29; Draft 3/10/2020 Hr'g Tr. at 90.  But these compensatory education hours stemmed from a Hearing Officer's prior determination that DCPS had denied D.B. a FAPE for the 2013–2014 school year.  *See* Pl.'s Rpt. at 4–5; Def.'s Rpt. at 5–6.  Accordingly, the court does not consider these hours in assessing a compensatory education award for the 2014–2015 and 2015–2016 school years.

[3] Dr. Nguyen's report reduced the 2015–2016 school year by 18 weeks due to D.B.'s lengthy hospitalization following complications from scoliosis surgery.  *See* Def.'s Rpt. at 30.  The court does not discount this time when assessing the compensatory education award, however.  Defendant cites no authority for the proposition that a student's absence from school for medical reasons relieves the school of its obligation to provide a FAPE.  Indeed, Department of Education regulations contemplate different "placement" options that school boards must make available to disabled students, including "regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions." 34 C.F.R. § 300.551.  As a recent Department of Education policy document explains, "it has long been the Department's position that when a child with a disability is classified as needing homebound instruction because of a medical problem, as ordered by a physician, and is home for an extended period of time (generally more than 10 consecutive school days), an individualized education program (IEP) meeting is necessary to change the child's placement and the contents of the child's IEP, if warranted."  The IEP Team must

To start, the court rejects Dr. Nguyen's proposal to place D.B. in a residential education setting such as the Maryland School for the Blind.  Plaintiff, D.B.'s mother, does not consent to such a placement, and Defendant cites no authority that would allow the court to compel a placement at a residential school that is over forty miles away, or to reject an otherwise reasonable compensatory education award providing daytime instruction because the mother declined the District's offered residential placement.  Indeed, the IDEA requires that students be placed in "the least restrictive environment possible—that is, the one that provides 'some educational benefit' and 'most closely approximates' the education a disabled child would receive if she had no disability." *Leggett v. District of Columbia*, 793 F.3d 59, 73 (D.C. Cir. 2015) (quoting *Kerkam v. Superintendent, D.C. Pub. Schs.,* 931 F.2d 84, 86 (D.C. Cir. 1991)); *see also* 20 U.S.C. § 1412(a)(5)(A) ("To the maximum extent appropriate," a school district's special education accommodations should take place in the "least restrictive environment" available.).  It is plain that a residential program—a full-time program away from non-disabled peers that would separate D.B. from his family at least five days a week—is more restrictive than a day program, and Defendant's expert concedes as much.  *See* Draft 3/10/2020 Hr'g Tr. at 97.  Given this, the court will not award compensatory education in the form of a placement at Maryland School for the Blind or another residential program.[4]

The compensatory education award must then take the form of hours provided to D.B. in a day-program setting.  The D.C. Circuit has rejected a "cookie cutter approach" that presumes "that

---

determine whether the child could "benefit from homebound services."  Department of Education, Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak (March 2020), available at https://sites.ed.gov/idea/files/qa-covid-19-03-12-2020.pdf.

[4] While Dr. Nguyen may be correct that D.B. could make more progress at a residential program than in a day program, it is undisputed that the IDEA does not require a placement that provides the "best possible education or even a 'potential-maximizing' one." *Legett*, 793 F.3d at 70 (quoting *Bd. of Ed. of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 197 n.21 (1982)).  Rather, a placement is generally "proper under the Act" if "reasonably calculated to enable the child to receive educational benefits."  *Id.*

each hour without FAPE entitles the student to one hour of compensatory instruction." *Reid*, 401

F.3d at 523.  Courts in this jurisdiction conduct a "qualitative, fact-intensive" inquiry "tailored to

the unique needs of the disabled student." *Branham*, 427 F.3d at 9 (discussing *Reid*).   The court

finds that Plaintiff's expert's recommendation is the product of such a qualitative, fact-intensive

inquiry, and it is tailored to meet D.B.'s unique needs.  Michney's recommendation—1,100 hours

of specialized instruction, 88 hours of occupational therapy, 100 hours of adapted physical

education therapy, and 132 hours of orientation and mobility support therapy—is not strictly a

one-to-one ratio of service hours D.B. was denied, and in fact taken together represents fewer

service hours than D.B. was denied.   Michney testified that he arrived at this award after

considering the service hours D.B. missed during the 2014–2015 and 2015–2016 school years,

D.B.'s progress thus far, D.B.'s cognitive profile and functional skills, and the rate of expected

progress based on his previous and current evaluations.  Draft 3/10/2020 Hr'g Tr. at 29–30.  While

Defendant questions the "practical[ity]" of such an award, *see id*. at 74, the court notes D.B.'s

regression across nearly every metric of development and the fact that Defendant's own expert

report explained that D.B. "needs time to respond and process information," requires "several

breaks" when working with providers, and must have instructions repeated and reinforced.  Def.'s

Rpt. at 21.  Defendant also reported that D.B. can become easily discouraged and frustrated.  *Id.*

at 21–22, 24.  Given these hurdles, a larger number of service hours is appropriate.  *See Kelsey v.*

*District of Columbia*, 85 F. Supp. 3d 327, 332, 337 (D.D.C. 2015) (awarding 1.5 hours of

compensatory education for every 1 hour denied given the student's "likely frustration, resistance

to learning, and the need to build confidence" (internal quotation marks omitted)).

Calculating the value of the education D.B. has been denied is undeniably an imprecise

endeavor.  The court is satisfied, however, that this award fairly approximates the education D.B.

lost and meets the "fact-specific" inquiry required by *Reid* to tailor D.B.'s award to his specific needs. *See Reid*, 401 F.3d at 524; *see also Mary McLeod Bethune Day Academy Pub. Charter Sch. v. Bland*, 555 F. Supp. 2d 130, 133–34 (D.D.C. 2008) (upholding a compensatory education award when the hearing officer first calculated the difference between the student's prescribed hours of specialized instruction and the hours that he received, then compared that total to the expert's recommended award, because the hearing officer "conducted a fact-specific inquiry and tailored the award to [the student's] individual needs by taking into account the results of [an evaluation] and the recommendations of [an expert]").

## V.

For the foregoing reasons, the court orders the following compensatory education award to remedy the denial of FAPE for the 2014–2015 and 2015–2016 school years:

(1) 1,100 hours of specialized instruction in all areas of the Expanded Core Curriculum or the equivalent (independent living skills, orientation and mobility, social interaction, self-determination, assistive technology, recreation, sensory efficiency, career education, and compensatory skills), including tutoring from a nationally certified literary Braille teacher of the Blind;

(2) 88 hours of occupational therapy services;

(3) 100 hours of adapted physical education; and

(4) 132 hours of orientation and mobility support services.

Dated:  July 15, 2020

Amit P. Mehta
United States District Court Judge